UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 13 2011 ★

------------------------------------------------------- X
                        :

PATRICIA KNIGHT,                       :

                       Plaintiff,     :

                          :

       - against -            :

                          :

MICHAEL J. ASTRUE, Commissioner of
Social Security,                  :

                          :

                Defendant.    :

                          :
------------------------------------------------------- X

BROOKLYN OFFICE

**MEMORANDUM**
**DECISION AND ORDER**

10 Civ. 5301 (BMC)

**COGAN**, District Judge.

     Plaintiff seeks review under the Social Security Act, 42 U.S.C. § 405(g), of the determination of an Administrative Law Judge ("ALJ") that she is not disabled. She asserts internal derangement of the left knee, right knee pain, obesity, and hypertension as the conditions warranting a contrary finding. In her memorandum of law in support of her motion for judgment on the pleadings, plaintiff argues that the ALJ failed to follow the treating physician rule, to properly consider her obesity, and to properly evaluate her credibility. She also argues that the Appeals Council failed to properly consider new and material evidence accompanying her request for review of the ALJ's decision.

     The ALJ rejected evidence from plaintiff's treating physicians without an adequate explanation. The opinions of these treating physicians supply a significant counterweight to the ALJ's and Appeals Council's conclusion that plaintiff can perform sedentary work. The case is therefore remanded.

## BACKGROUND

Plaintiff filed an application for Social Security Disability Insurance benefits on August 4, 2006, alleging a disability onset of November 1, 2005.[1] Her application was denied on January 2, 2007, and she filed a request for a hearing, which was held before ALJ Marilyn P. Hoppenfeld on October 4, 2007.  The ALJ denied plaintiff's application on April 25, 2008, but the Appeals Council granted plaintiff's request for review, vacated the hearing decision, and remanded the case back to the ALJ for further proceedings in an order dated October 10, 2008.  Another hearing was held before the ALJ on February 6, 2009, following which the ALJ issued a second decision on September 16, 2009, again denying plaintiff's application for disability benefits.  In response, plaintiff requested review of the ALJ's decision by the Appeals Council, which denied the request on September 24, 2010.  Plaintiff subsequently initiated this action on January 17, 2010.

At the time of the ALJ's second decision, which is the subject of my review, plaintiff was fifty-two years old.  She had completed high school.  Plaintiff resides with her mother and stepfather and is divorced, with no children.  Prior to her disability onset date, plaintiff worked as a counselor at a juvenile detention center from August 1994 to October 2005.  As a counselor, plaintiff walked for six hours per day, stood for five hours per day, and sat for one hour per day.  Her past employment also includes work as a security guard from to 1987 to 1989 and as a clerk or office aid typist from 1981 to 1986.[2]  On May 30, 2001, plaintiff suffered a work-related torn lateral meniscus and torn

---

[1] Plaintiff filed an earlier SSD application on January 9, 2006, which was denied on March 23, 2006. Plaintiff did not request a hearing before the ALJ, and instead filed a second application on August 4, 2006, which is the subject of this action.

[2] I am accepting plaintiff's version of her employment history, as relied upon by the ALJ in her second decision of September 16, 2009.  Although this version conflicts with that offered in the Commissioner's

anterior horn of the meniscus, for which she received diagnostic arthroscopy and partial synovectomy from Dr. Lancelot Young.

Plaintiff was injured again on October 31, 2005, when a resident at the juvenile detention center pushed a table into her knees.[3]  She stopped working after this incident, and received Worker's Compensation benefits and long-term disability insurance payments.

Since her most recent injury, plaintiff has continuously complained of pain to both knees and to her left ankle, despite ongoing physical therapy and medication treatments.  Plaintiff asserts that her impairments have hampered her ability to walk, stand, sit, bend, and kneel.  She can walk one to two blocks with a cane, but experiences ankle swelling thereafter; she can stand for only thirty minutes and can sit for thirty minutes before her knees become stiff; if she bends, her knees also become stiff, and she cannot kneel at all.  If plaintiff drives a distance greater than fifty miles, her knees become stiff and her body becomes tired.  Plaintiff must elevate her knees every other night and for one to three hours during the day.  She also wears a brace daily to relieve pressure when she walks.

On a typical day, plaintiff rises between eight and nine o'clock in the morning, and takes a shower.  She then dresses, but must sit down in order to do so.  Plaintiff exercises her knees and uses a stimulator and heat on her left leg.  She attends physical therapy two days a week and visits a doctor once a month.  She often, but not regularly, attends church, but only stays for one hour.  Her mother prepares her meals.

---

memorandum and in the Disability Reports dated January 13, 2006, and February 14, 2007, the disparity is immaterial to the outcome of this case.

[3] The October 31, 2005 injury was the catalyst and basis for plaintiff's SSD application and is the injury relevant to this action.

Treatment options for plaintiff have ranged from taking pain medication to physical therapy.  She has been prescribed ibuprofen to help alleviate bursitis and is still currently taking naproxen to help alleviate pain in the left knee.  Plaintiff also received Visco and Supartz injections.  Plaintiff's treating orthopedic surgeon, Dr. Berkowitz, recommended arthroscopic surgery in 2006, but was not granted authorization by the Worker's Compensation Board to perform it.  Other medical findings pertaining to plaintiff's situation are summarized below.

I.    **Treating Physicians**

**A. Dr. Robert J. Hecht, Island Musculoskeletal Care (physiatrist)**

Seeking a second opinion regarding her disabling injury, plaintiff first saw Dr. Robert Hecht on November 4, 2005.  Upon examining plaintiff, Dr. Hecht detected diffuse tenderness in and swelling of the left knee.  He diagnosed her with sprain of the left knee, recommending physical therapy and Naprosyn.  Dr. Hecht reported that plaintiff's condition remained the same on November 18, 2005, and requested a left knee MRI.  He again requested the MRI and opined that plaintiff was disabled on December 16, 2005.  Plaintiff's condition was unchanged during visits on January 13, 2006 and February 10, 2006.  On plaintiff's visit of June 20, 2006, Dr. Hecht reviewed her recent left knee MRI and noted tenderness in the medial joint line of the knee, restricted range of motion, and swelling.

Dr. Hecht maintained that plaintiff was disabled during follow-up visits on May 9, 2008, June 20, 2008, August 1, 2008, September 12, 2008, October 24, 2008, December 5, 2008, and January 23, 2009.

**B. Dr. Jean Claude Demetrius, Midwood Total Rehabilitation Medical P.C. (physiatrist)**

Dr. Jean Claude Demetrius began treating plaintiff on March 2, 2006.  Upon examining plaintiff, Dr. Demetrius detected impaired light tough and pinprick sensation in the L5-S1 dermatones, an antalgic gait, decreased squatting, decreased toe and heel walking, swelling of the left knee, exquisite tenderness of the left patella, painful range of motion in the knee, and decreased muscle strength of the left quadriceps.  He diagnosed left knee derangement and noted that plaintiff had difficulty carrying heavy objects, sitting and standing for extended periods of time, walking, running, bending, navigating stairs, squatting, and kneeling.  Dr. Demetrius prescribed Naprosyn and instructed plaintiff to undergo an MRI of the left knee, receive physical therapy three times a week, and be evaluated by an orthopedic surgeon.  An MRI of the left knee performed on June 22, 2006, showed trace joint effusion, mild patellar alta, and lateral displacement of the patella.

Dr. Demetrius's examination of plaintiff on July 6, 2006 revealed left knee swelling, tenderness on palpation of the patella, painfully restricted range of motion for extremes, and muscle strength of 4/-5 in the left quadriceps.  There was also mild swelling and tenderness on palpation of the patella in the right knee, with range of motion painfully restricted for extremes.  Dr. Demetrius stated that plaintiff "is considered totally disabled."  The diagnosis of left knee derangement remained unchanged.  On plaintiff's September 5, 2006, visit, Dr. Demetrius diagnosed her with both left and right knee derangement.  When plaintiff returned for a follow-up exam on October 5, 2006, Dr. Demetrius noted similar findings and maintained once again that plaintiff was disabled.  At that point, Dr. Demetrius's diagnosis included left knee internal derangement and pain

to the right knee.  No major changes were noted on later visits of December 5, 2006, March 6, 2007, June 5, 2007, and July 3, 2007.

During plaintiff's last recorded series of visits with Dr. Demetrius on August 7, 2007, September 11, 2007, and October 9, 2007, Dr. Demetrius detected in the left knee exquisite tenderness on palpation of the patella and the medial aspect, painfully restricted range of motion, and muscle strength of 3-/5 in the left quadriceps.  He also noted tenderness on palpation of the patella in the right knee and mild swelling with tenderness, but intact range of motion in the left ankle.  He maintained that plaintiff was disabled. Dr. Demetrius's diagnosis on August 7, 2007 and September 11, 2007 included left knee internal derangement, right knee pain, and left ankle sprain.  This diagnosis was slightly modified on October 9, 2007, when Dr. Demetrius substituted left ankle bursitis for left ankle sprain.

Additionally, Dr. Demetrius completed a multiple impairment questionnaire dated September 18, 2007, in which he opined that plaintiff was not able to sit for more than two hours nor stand or walk for more than one hour in an eight-hour workday.  He wrote that it would be necessary or medically recommended for plaintiff not to sit, stand, or walk continuously in a work setting, and that plaintiff would need to get up and move around for fifteen minutes at thirty minute intervals.  In his opinion, plaintiff could lift and carry up to five pounds frequently and five to twenty pounds occasionally.

### C. Dr. Dov Berkowitz, Advanced Orthopaedics, P.L.L.C. (orthopedic surgeon)

Dr. Dov Berkowitz first examined plaintiff on September 21, 2006, based on a referral from Dr. Demetrius.  He wrote that plaintiff had difficulty flexing her knee beyond 100 degrees and that she had marked patellofemoral tenderness.  Dr. Berkowitz recommended a brace for support and that plaintiff consider an exploratory arthroscopic procedure.  On November 2, 2006, after plaintiff failed to improve, Dr. Berkowitz requested approval for the procedure from the Workers' Compensation Board and submitted a second request to the Board on December 7, 2006, but both requests were denied.

### D. Dr. Mitchell Goldstein, Orlin & Cohen Orthopedic Associates, L.L.P. (orthopedic surgeon)

Dr. Mitchell Goldstein began treating plaintiff on March 1, 2007.  Upon examination, Dr. Goldstein noted that plaintiff had a marked antalgic gait, left knee retropatellar tenderness, tenderness of the medial and lateral join lines, positive Apley grind test, and range of motion of up to ninety degrees.  He diagnosed plaintiff with chondral lesion of the left knee, for which he requested Visco lubricant injections, and encouraged plaintiff to lose weight, continue using a cane for ambulation, and continue taking pain medication as needed.  On May 24, 2007 and July 5, 2007, Dr. Goldstein maintained his diagnosis of left knee chondral lesion and opined that plaintiff was totally disabled.  He also noted a range of motion of up to ninety degrees in the left knee, positive Apley's test, crepitus and muscle strength of 4/5.  There were no major changes reported on plaintiff's follow-up visit of August 16, 2007.

On September 26, 2007, plaintiff again visited Dr. Goldstein.  In his report, Dr. Goldstein noted left knee range of motion of 5 to 110 degrees, a positive McMurray's

test, difficulty squatting, tenderness over the left ankle with dorsiflexion to ten degrees, left ankle plantar flexion to twenty degrees, and limited inversion. He also noted a negative Lachman's test and anterior drawer. Dr. Goldstein diagnosed plaintiff with internal derangement of the left knee, arthritis, synovitis and a left ankle sprain, and requested Visco injections for plaintiff's left knee. On the next follow-up visit of November 7, 2007, Dr. Goldstein diagnosed plaintiff with internal derangement of the left knee, chondromalacia, a left ankle sprain and tendinitis. He also performed a Visco lubricant injection on plaintiff's left knee. Plaintiff returned for a follow-up visit on January 28, 2008, and there were no significant changes noted.

Dr. Goldstein's diagnosis was slightly modified on September 23, 2008, with internal derangement of the left knee, chondromalacia patellae syndrome, and left ankle sprain recorded as his impressions. On both November 11, 2008, and December 9, 2008, Dr. Goldstein diagnosed plaintiff with chondromalacia patellae syndrome, knee pain, and ankle sprain, and administered a Supartz injection. Plaintiff's condition and diagnosis remained substantially the same on January 27, 2009 and during subsequent monthly visits through July 14, 2009.

Dr. Goldstein completed a lower extremities impairment questionnaire on December 22, 2009, in which he assessed plaintiff's residual functional capacity (RFC). He opined that plaintiff was only capable of sitting between three and five hours and of standing or walking for under one hour in an eight-hour workday. In his opinion, it was necessary or medically recommended for plaintiff not to sit, stand, or walk continuously in a work setting. Upon experiencing pain, plaintiff would need to get up and move around for ten minutes at ten to fifteen minute intervals. Dr. Goldstein also noted that

plaintiff could lift and carry up to five pounds occasionally, and estimated that plaintiff would be absent from work more than three times per month due to her impairments.

## II.    Examining Physicians

### A. Dr. Frank Hudak, Queens Orthopedic Surgery, P.C. (orthopedic surgeon)

Plaintiff was first examined by Dr. Frank Hudak on May 24, 2006, as per the request of the Worker's Compensation Board. Dr. Hudak noted that the left knee had a range of motion from 0 to 120 degrees, while the right knee had a range of motion from 0 to 128 degrees. He also detected old scarring over the tibial tubercle of the left knee and over the middle portion of the left patella, as well as crepitus in the retropatellar area. The left knee, he found, was stable with no effusion. Dr. Hudak additionally detected some mild retropatellar crepitus in the right knee and some mild atrophy of the left thigh. Otherwise, he opined that plaintiff had good motor power to both right and left lower extremities. He diagnosed plaintiff with aggravation of pre-existing chondromalacia of the left knee and sprain and contusion of the left knee. Dr. Hudak recommended that plaintiff continue physical therapy treatment and that she undergo an MRI of her left knee.

Dr. Hudak examined plaintiff again on June 12, 2008. Range of motion of the left knee was reported as 0 to 125 degrees and range of motion of the right knee reported as 0 to 140 degrees. Dr. Hudak also noted bilateral patellofemoral crepitus in both knees, but no tenderness in the medial or lateral compartments of the left knee. The left knee was found stable to stress testing, with a negative McMurray's sign. Dr. Hudak again detected slight atrophy of the left thigh and good motor power to the lower extremities.

He diagnosed plaintiff with chondromalacia and arthritis of the left knee and opined that she had a mild partial disability.

### B. Dr. Kautilya Puri, Industrial Medicine Associates, P.C. (neurologist)

Dr. Kautilya Puri, a consultative examiner for the Social Security Administration, first saw plaintiff on September 28, 2006. He noted that plaintiff was mildly limping and had mild difficulty walking on her heels and toes. Dr. Puri also reported that plaintiff enjoyed full range of motion of her right knee and both ankles, but in the left knee showed some mild decrease in flexion and extension, with range of motion of 0 to 120 degrees, and some mild local tenderness. Plaintiff had muscle strength of 5/5 bilaterally in the upper and lower extremities.

### III.    Expert Testimony

### A. Dr. John Axline, Independent Medical Expert (orthopedic surgeon)

Dr. John Axline reviewed the evidence in the record and testified as an independent medical expert at plaintiff's second hearing before the ALJ on February 6, 2009. He opined that plaintiff's only impairment was left knee sprain with patellar chondromalacia, and that she did not have an impairment constituting a *per se* disability on Listing 1.02A. He also believed that plaintiff could stand and walk for a total of two hours in an eight-hour workday, could lift and carry twenty pounds occasionally, and had an unlimited capacity for sitting.

After receiving and reviewing additional evidence from the ALJ following the hearing, comprised of medical reports from Dr. Goldstein and Dr. Hecht, Dr. Axline stated that the additional evidence did not alter his testimony.

**B. Andrew Pasternak, Vocational Expert**

Andrew Pasternak testified as a vocational expert at the second hearing before the ALJ on February 6, 2009.  Pasternak testified that plaintiff had acquired recordkeeping skills, clerical skills, and investigative skills from her previous employment in protective services.  He also opined that an individual of fifty-one years of age, with plaintiff's education, vocational experience, and skillset, would be able to perform one of five sedentary jobs existing in significant numbers in the national economy: police and fire dispatcher, police aide, skip tracer, order clerk, and record clerk.

## THE ALJ'S DECISION

The ALJ employed the prescribed five-step analysis to determine whether plaintiff was "disabled" under the Social Security Act.  20 C.F.R. § 404.1520(a).  As an initial matter, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act, in which the claimant's disability must have occurred on or before the date before he was last insured for disability benefits.  42 U.S.C. § 423(c); 20 C.F.R. § 404.132.  Because plaintiff had "acquired sufficient quarters of coverage to remain insured through December 31, 2010," and her alleged disability onset was November 1, 2005, she was potentially eligible for SSD benefits.  At step one, the ALJ concluded that plaintiff did not engage in substantial gainful activity since the alleged disability onset date.  At step two, the ALJ found that plaintiff's impairments, which include left knee sprain, status post an arthroscopic procedure, sprain of left ankle, left ankle bursitis abnormality, and right knee pain, ranked as "severe."  However, at step three of the analysis, the ALJ concluded that plaintiff "did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R.

Part 404, Subpart P, Appendix 1." The ALJ based this determination on the record and the independent medical expert's testimony.

Because the ALJ determined that plaintiff's impairments did not meet the requirements of any impairments described in the Listings, the ALJ was required to assess plaintiff's residual functional capacity at step four. The ALJ concluded that plaintiff had the RFC "to perform the full range of sedentary work," including "sitting for six hours in an eight hour day; standing and walking for two hours and lifting and carrying ten pounds occasionally." In evaluating plaintiff's RFC, the ALJ considered the reports of all treating and examining physicians, but accepted the opinion of the medical expert. Based on this RFC determination, the ALJ concluded that plaintiff was "limited to physical activity that permits sedentary work and is unable to unable to perform her past relevant work."

At step five, the ALJ, relying on the testimony of the vocational expert, concluded that "there are a significant number of jobs existing in the National Economy, to which claimant is capable of performing and transferring her skills." As a result, the ALJ reached the ultimate finding that plaintiff was not "under a disability, as defined in the Social Security Act, for the period in question."

## DISCUSSION

I.    **The Legal Framework**

Disability benefits are available to anyone who is deemed "disabled" as that term is defined in 42 U.S.C. §§ 423(d) and 1382c. A person is "disabled" when "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" consists of "an

impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic

technique." Id. at § 1382c(a)(3)(D).

The Commissioner determines whether a plaintiff meets the statutory definition of

"disabled" in five successive steps. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.

1982); 20 C.F.R. §§ 404.1520, 416.920. These steps may be summarized as follows:

> (1) Is the plaintiff gainfully employed? If he is, then he is not disabled. If
> he is not, then the analysis proceeds to the second step.

> (2) Does the plaintiff have a "severe" impairment(s) – i.e., one that
> significantly limits his physical or mental ability to do basic work
> activities? If he does not, then he is not disabled. If he does, then the
> analysis proceeds to the third step.

> (3) Does the plaintiff's impairment(s) meet or equal a "listed
> impairment?" If it does not, then the analysis proceeds to the fourth
> step. If it does, then he is disabled.

> (4) Does the plaintiff's impairment(s) prevent him from doing his "past
> relevant work?" If it does not, then he is not disabled. If it does, then
> the analysis proceeds to the fifth and final step.

> (5) Does the plaintiff's impairment(s), considered in conjunction with his
> residual functional capacity, age, education, and past work experience,
> prevent him from engaging in other substantial gainful work
> reasonably available in the national economy? If it does not, then he is
> not disabled. If it does, then he is disabled.

Id. To determine the answers to steps four and five of this process, the ALJ must

consider plaintiff's RFC, which is the most an individual can still do despite his or her

physical and/or mental limitations that affect what he or she can do in a work setting. See

20 C.F.R. §§ 404.1545, 416.945. In other words, once the ALJ analyzes how much

plaintiff can do despite her impairments, the ALJ compares that ability to the requirements of plaintiff's past job (step four). If plaintiff cannot do her past job, the ALJ then considers whether there are other jobs that plaintiff can do despite her impairment (step five). Thus, one can only be deemed "disabled" at the third and fifth steps of the determination, whereas one can be deemed "not disabled" at every step except the third one.

"The burden of proving disability is on the plaintiff." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984). "[O]nce the plaintiff has established a prima facie case by proving that his impairment prevents his return to his prior employment [step four], it then becomes incumbent on the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the plaintiff could perform, considering his physical capability, age, education, experience, and training." Id.

In weighing the medical opinion evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d). These rules indicate that, generally, more weight is given to the following: (1) opinions provided by physicians who have actually examined a plaintiff; (2) opinions provided by a plaintiff's treating physicians; (3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with the record evidence as a whole; (5) opinions of specialists about medical impairments related to their area of expertise; and (6) opinions that may be supported by any other factors the plaintiff brings to the Commissioner's attention. Id. However, the Commissioner must give a treating physician's opinion "controlling weight" if his or her opinion: (1) concerns the "nature and severity of [an] impairment"; (2) "is well supported by medically acceptable clinical and laboratory diagnostic

techniques;" and (3) "is not inconsistent with other substantial evidence in [the] case record." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2)). This is known as the "treating physician rule."

## II.      Standard of Review

Judicial review of disability benefit determinations is governed by 42 U.S.C. §§ 421(d) and 1383(c)(3), which expressly incorporate the standards established by 42 U.S.C. § 405(g). In relevant part, § 405(g) adopts the familiar administrative law review standard of "substantial evidence," *i.e.*, that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then his decision must be affirmed. See Balsamo v. Chater, 142, F.3d 75, 79 (2d Cir. 1998) ("We set aside [an] ALJ's decision only where it is based upon legal error or is not supported by substantial evidence."). The Supreme Court has defined "substantial evidence" to connote "more than a mere scintilla[; i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971). "In determining whether substantial evidence supports a finding of the [Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." Rivera v. Sullivan, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).

### III.  Analysis

**A. The ALJ committed legal error in failing to adequately explain her rejection of the treating physician's RFC determination**

Plaintiff argues that the ALJ failed to follow the treating physician rule by declining to accept Dr. Demetrius's opinion regarding plaintiff's disabled status and RFC.  The ultimate determinations of a claimaint's RFC or disability are reserved to the Commissioner.  See 20 C.F.R. § 404.1527(e)(1)–(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ."); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative").  As a result, the ALJ was not required to accord controlling weight to Dr. Demetrius's opinion that plaintiff was disabled or to Dr. Demetrius's determination of plaintiff's RFC.

Nonetheless, the ALJ must consider a treating physician's opinion to the extent that it relates to decisions reserved to the Commissioner, or explain why he does not.  See Snell, 177 F.3d at 134.  In so doing, the ALJ may not rely on mere "conclusory statements," and instead must supply "good reasons" and attempt to reconcile the treating physician's opinion with conflicting opinions that are credited by the ALJ.  See Duncan v. Astrue, No. 09-CV-4462 (KAM), 2011 WL 1748549, at *18 (E.D.N.Y. May 6, 2011).

The animating purpose of this required explanation is to allow claimants to "understand the disposition of their cases, even – and perhaps especially – when those dispositions are unfavorable."  Snell, 177 F.3d at 134.  Otherwise, a claimant "who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not . . . ." Id.  If the reviewing court itself is "unable to fathom the ALJ's rationale in relation to the evidence in the record

without further findings or clearer explanation for the decision," the explanation supplied by the ALJ is deemed inadequate, and the ALJ's decision resultantly remanded. Duncan, 2011 WL 1748549, at *18 (quoting Pratts v. Charter, 94 F.3d 34, 39 (2d Cir. 1996)).

The ALJ explained that she found Dr. Demetrius's opinion as to disability to be of limited value because it was rendered in response to inquiries regarding plaintiff's capacity to perform her past work – a different inquiry then that undertaken by the ALJ at step five, during which the ALJ must determine whether plaintiff can perform any work at all. Furthermore, the ALJ accounted for the fact that Dr. Demetrius's report was submitted to the New York City Worker's Compensation Board, whose "definition of disability is different and not binding on Social Security." The ALJ thus provided understandable reasons to both plaintiff and the Court for her decision to reject Dr. Demetrius's disability determination.

With respect to plaintiff's RFC, the ALJ seems to have provided rather conclusory reasons for her decision to credit the opinion of the independent medical expert, Dr. Axline, over that of Dr. Demetrius. She stated that "the assessment and finding of the impartial consultant are consistent with substantial evidence including findings of treating and examining sources," but did not reference Dr. Demetrius's conflicting RFC determination or elucidate why it was not accepted. Instead, the reviewing court is left to assume that the ALJ simply adopted Dr. Axline's reasons for rejecting Dr. Demetrius's determination, which are provided in the ALJ's account of the relevant medical evidence. According to the ALJ's account, Dr. Axline maintained that Dr. Demetrius's RFC determination "did not add up," as it was not sensible for Dr. Demetrius to conclude that plaintiff "could sit only for two hours and could not stand or

walk for any time," while simultaneously concluding that plaintiff "could occasionally lift and carry twenty pounds." Dr. Axline "further pointed to Exhibit 30, [d]ated July 10, 2008,[4] which found no knee tenderness; no crepitation in Exhibit 28 and the gait and ligaments were normal on September 26, 2008, in Exhibit 26F."[5] Exhibit 30 contains the medical records of Dr. Hudak, plaintiff's examining physician, while Exhibits 28 and 26F contain the medical records of Dr. Hecht and Dr. Goldstein, respectively, who are both treating physicians of plaintiff.

However, these exhibits do not clearly substantiate Dr. Axline's RFC determination or discredit that of Dr. Demetrius. While Dr. Hudak's finding in Exhibit 30 that there was "no tenderness palpated in the medial or lateral compartments of the knee," may have been consistent with Dr. Hecht's finding of "negative crepitus" in Exhibit 28, it directly conflicts with Dr. Hecht's contemporaneous finding that plaintiff "had tenderness in the medial joint line of the knee." In addition, Dr. Goldstein, in Exhibit 26F, noted that plaintiff had a "[n]on-antalgic gait" and "[n]egative Lachman and anterior drawer," but still found "Positive McMurray," signifying some sort of tear in the lateral meniscus. Hence, it appears that Dr. Axline selectively harnessed medical evidence in explaining his rejection of Dr. Demetrius's RFC determination. In accepting this flawed explanation without further elaboration or clarification, the ALJ failed to supply "good reasons" for her decision to credit Dr. Axline's RFC opinion at the expense of Dr. Demetrius's. See Duncan, 2011 WL 1748549, at *24 (stating that the ALJ "cannot

---

[4] The report contained in Exhibit 30 is dated June 12, 2008. I cannot locate any report in the medical record that is dated July 10, 2008 and so will assume that the ALJ was referring to Dr. Hudak's report of June 12, 2008, marked as Exhibit 30.

[5] The report contained in Exhibit 26F is dated September 26, 2007. Since I cannot locate a different report that is dated September 26, 2008, I will assume that the ALJ was referring to Dr. Goldstein's report of 2007, marked as Exhibit 26F.

simply selectively choose evidence in the record that supports his conclusions")

(quotations omitted).  Because I cannot understand the ALJ's "rationale in relation to the

evidence in the record without further findings or clearer explanation of the decision"

with respect to the RFC determination, I am compelled to remand the ALJ's decision on

these grounds.

### B. The ALJ properly considered plaintiff's obesity in declining to classify it as a "severe impairment" and in concluding that it did not affect plaintiff's RFC

Based on her memorandum in support of her motion for judgment on the

pleadings, it appears that plaintiff contests the ALJ's findings that plaintiff's excessive

weight did not constitute a "severe impairment" and did not affect plaintiff's RFC.

Plaintiff contends that "it was unreasonable for the ALJ to conclude that [plaintiff's]

obesity had no impact on the pain she experienced in [weight-bearing] joints just because

. . . no physician spoke directly on the subject of how her obesity impacted the joints."

However, the Second Circuit has indicated that these are the very grounds that would

permit the ALJ to decide against listing plaintiff's obesity as a "severe impairment."  See

Martin v. Astrue, 337 Fed. Appx. 87, 89 (2d Cir. 2009) (holding that ALJ's failure to

recognize plaintiff's obesity as a severe impairment was supported by substantial

evidence because plaintiff's medical records mentioned "obesity only four times and

provide[d] no evidence of a severe impairment limiting work ability").  While the ALJ

acknowledged that plaintiff weighed between 240 and 245 pounds in 2008 and noted Dr.

Goldstein's recommendation that she lose weight, the ALJ found that there was no

evidence to suggest that plaintiff's excessive weight constituted a severe impairment, as

"no treating or examining source indicated the claimant's ability to function was limited

by weight." See 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is

not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

The ALJ again considered plaintiff's weight in connection with her RFC determination, stating that "claimant was overweight, for the period in question, but no treating or examining source indicated limitations secondary to weight." She therefore "found for the period in question, [that] the claimant's ability to function was not limited by weight." In so doing, the ALJ, contrary to plaintiff's argument, did apply the provisions of Social Security Ruling 02-1p, even if she did not explicitly refer to the specific ruling. All that SSR 02-1p requires is for ALJs to assess whether obesity causes a "limitation of function" and affects the "individual's ability to perform routine movement and necessary physical activity within the work environment," and to "explain how we reached our conclusions on whether obesity caused any physical or mental limitations." See SSR 02-1p, 2000 WL 628049, at *4 (Sept. 12, 2002). This requirement is contingent on an ALJ's initial identification of obesity as a medically determinable impairment of the claimant. In the instant case, the ALJ never explicitly characterizes the plaintiff as obese, instead using the adjective of "overweight." But even assuming that the ALJ did identify obesity as one of plaintiff's medically determinable impairments, she certainly assessed plaintiff's weight in the context of her RFC determination and provided reasons for why she found that it did not impact plaintiff's ability to function.

Plaintiff's citation to my earlier decision in Kazanjian v. Astrue is misplaced. In Kazanjian, I ruled that the ALJ was required to, but failed to, consider plaintiff's obesity when "evaluating the credibility of statements as to the 'intensity, persistence, and limiting effects,' of her symptoms." Kazanjian, No. 09 Civ. 3678 (BMC), 2010

WL3394385, at *11 (E.D.N.Y Aug. 25, 2010) (quoting SSR 96-7p, 1996 WL 374186, at

*3) (July 2, 1996).  In the instant case, the ALJ did not consider the plaintiff's obesity in

the context of this credibility assessment, but was not required to, as she found that the

"claimant's medically determinable impairments could not reasonably be expected to

cause the alleged symptoms . . . ."  See SSR 96-7p at *2 (explaining that only "[w]hen the

existence of a medically determinable physical or mental impairment(s) that could

reasonably be expected to produce the symptoms has been established, the intensity,

persistence, and functionally limiting effects of the symptoms must be evaluated . . . .").

**C. The ALJ's credibility assessment of plaintiff's statements concerning her
symptoms was not necessary to the ALJ's RFC determination**

Although plaintiff argues that the ALJ "failed to properly evaluate [her]

credibility," errors committed by the ALJ in that regard, assuming there are any, do not

affect the ultimate RFC determination.  In determining a claimant's RFC, an ALJ must

consider the claimant's symptoms and the extent to which his symptoms can "reasonably

be accepted as consistent with the objective medical evidence and other evidence."  20

C.F.R. § 404.1529(a).  In so doing, the ALJ must first determine whether there is a

"medically determinable physical or mental impairment(s) that could reasonably be

expected to produce the symptoms" alleged by the claimant.  SSR 96-7p at *1; see also

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).  If the ALJ determines that the claimant

suffers from such an impairment, the ALJ must then evaluate the "intensity, persistence,

and functionally limiting effects of the symptoms" in order to determine how extensively

these symptoms affect the claimant's ability to perform basic work activities.  SSR 96-7p

at *1.  "This requires the adjudicator to make a finding about the credibility of the

individual's statements about the symptom(s) and its functional effects."  Id.

Because the ALJ "found that the claimant's medically determinable impairments could not reasonably be expected to cause the alleged symptoms," her subsequent credibility analysis was not a necessary element of her RFC determination. See SSR 96-7p at *2. ("The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms . . . . [If] there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.").  As a result, any challenges to the ALJ's analysis and ultimate decision regarding plaintiff's credibility are not grounds for remand.

### D. The Appeals Council failed to properly evaluate new and material evidence in deciding that such evidence did not provide a basis for changing the ALJ's decision

Plaintiff contends that the Appeals Council "failed to consider new and material evidence" that she submitted to the Council following the ALJ's decision of September 16, 2009.  This evidence consisted of, *inter alia*: a lower extremities impairment questionnaire from Dr. Goldstein, dated December 22, 2009; medical records from Dr. Goldstein, dated January 27, 2009, through July 14, 2009, as well as January 5, 2010; and a lower extremities impairment questionnaire and narrative report from a Dr. Leon Sultan, dated January 11, 2010.  The Appeals Council stated that it had considered the additional evidence but "found that this information does not provide a basis for changing the Administrative Law Judge's decision."

The Appeals Council must consider evidence proffered by a claimant that is both

new and material.  See Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991); 20 C.F.R. §

404.970(b). The Second Circuit has defined "new evidence" as evidence that has not

been considered previously and is "not merely cumulative of what is already in the

record." Id. "Material evidence" refers to evidence that "is both relevant to the

claimant's condition during the time period for which benefits were denied and

probative." Id. "The concept of materiality requires, in addition, a reasonable possibility

that the new evidence would have influenced the Secretary to decide the claimant's

application differently." Id. Because plaintiff's evidence was submitted to the Appeals

Council, and not to this Court directly, there is no requirement for plaintiff to show good

cause for her failure to submit the evidence at an earlier point. See Perez v. Chater, 77

F.3d 41, 45 (2d Cir. 1996).

   The Commissioner argues that of the specific items of evidence listed above, only

Dr. Goldstein's medical reports from January through July of 2009 are material.  Dr.

Goldstein's lower extremities impairment questionnaire, it explains, "post-dates the

September 16, 2009 hearing decision," and therefore does not require consideration by

the Appeals Council.  I disagree.  The Second Circuit has held that "medical evidence

generated after an ALJ's decision cannot [be] deemed irrelevant solely because of

timing." Newbury v. Astrue, 321 Fed. Appx. 16, 18 n.2  (2d Cir. 2009) (citing Pollard v.

Halter, 377 F.3d 183, 193 (2d Cir. 2004)).  As long as the evidence relates back to the

period for which disability benefits were denied, the evidence is considered to be

material.  Although Dr. Goldstein's questionnaire was completed on December 22, 2009,

its assessment of plaintiff's residual functional capacity clearly relates back to the period

pre-dating the ALJ's decision of September 16, 2009, as plaintiff had last visited Dr.

Goldstein on July 14, 2009. There is no evidence in the record indicating that Dr.

Goldstein actually examined plaintiff on December 22, 2009, and as a result, any medical

opinions offered must be based on previous examinations conducted during the disability

period. I therefore find that Dr. Goldstein's questionnaire qualifies as new and material

evidence.[6] See Shrack v. Astrue, 608 F. Supp. 2d 297, 302 n.2 (D. Conn. 2009) ("To the

extent that the findings and conclusions discussed in Dr. Cretella's March 1, 2007 letter

can be attributed to his observations during the time period at issue, that letter is new and

material evidence . . . .").

When the evidence submitted is, in fact, new and material, the Appeals Council

must "evaluate the entire record including the new and material evidence submitted . . .

[and] then review the case if it finds that the administrative law judge's action, findings

or conclusion is contrary to the weight of the evidence currently of record." Perez, 77

F.3d at 44 (quoting 20 C.F.R. § 404.970(b)). As noted above, the Appeals Council in the

instant case denied review after finding that the newly submitted evidence did not

"provide a basis for changing" the ALJ's decision. I am unconvinced that the addition of

Dr. Goldstein's questionnaire, which very significantly undermines the ALJ's

determination that plaintiff can perform sedentary work, does not now tip the weight of

the evidence against the ALJ's ultimate conclusion – at least not without further

explanation from the Commissioner.

---

[6] I do not extend this finding to Dr. Sultan's questionnaire and narrative report of January 11, 2010, which is also the date of plaintiff's first visit with Dr. Sultan. Although Dr. Sultan wrote that his description of plaintiff's symptoms and limitations applied as early as October 31, 2005, this opinion is somewhat speculative, as Dr. Sultan never once examined plaintiff during the disability period. I therefore find plaintiff's argument that Dr. Sultan's opinion relates back to the period of disability to be unpersuasive. See Toribio v. Barnhart, No. 02 CIV. 4929 (GEL), 2003 WL 21415329, at *7 (S.D.N.Y. June 18, 2003) (lending little credence to treating physician's "retrospective conclusions about [plaintiff's] condition during the relevant time period," which was "well before he had ever met the patient").

In her decision, the ALJ explained that she accepted the opinion of the medical expert regarding plaintiff's RFC and found it to be "consistent with substantial evidence including findings of treating and examining sources . . . ." In fact, one of her reasons for endorsing the medical expert's RFC determination was that "Dr. Mitchell Goldstein, an orthopedic surgeon and treating source, did not conclude that the claimant was disabled and provided findings that do no[t] support a finding of disability." However, Dr. Goldstein's questionnaire, which contains an RFC determination and is now included in the record, does support a finding of disability under SSA rules. Dr. Goldstein opined that during an eight hour workday, plaintiff could only sit for three to five hours and stand or walk for under one hour. He also noted that plaintiff could only occasionally lift and carry up to five pounds, and that it would be necessary or medically recommended for plaintiff not to sit, stand, or walk continuously in a work setting. Given that sedentary work requires an individual to be capable of sitting for six hours, standing and walking for two hours, and lifting and carrying ten pounds occasionally in an eight-hour day, Dr. Goldstein's RFC determination is inconsistent with that of the ALJ. See Perez, 77 F.3d at 46; 20 C.F.R. § 404.1567(a). When combined with Dr. Demetrius's RFC determination, which also found plaintiff to be incapable of performing sedentary work, Dr. Goldstein's questionnaire – based on over two years of consistent visits with plaintiff – seriously calls into question the ALJ's reliance on the RFC opinion of the independent medical expert, who never once examined plaintiff.

Consideration of the new evidence by the ALJ, or at the very least, further explanation from the Appeals Council as to why it denied plaintiff review, is warranted. Without reaching a conclusion as to whether the ALJ's decision was supported by

substantial evidence, courts have remanded in situations where new evidence submitted to the Appeals Council "significantly discredited or undercut the ALJ's decision to deny benefits." Fernandez v. Apfel, CIV. A. CV-977532DGT, 1999 WL 1129056, at *4 (E.D.N.Y. Oct. 4 1999) (citing Sobolewski v. Apfel, 985 F. Supp. 300, 315 (E.D.N.Y. 1997)); see Brown v. Apfel, 174 F.3d 59, 60 (2d Cir. 1999) (remanding case to Commissioner "because new medical evidence that Brown submitted to the Social Security Appeals Council following the ALJ's decision undermines the findings on which the ALJ's denial of Brown's claims was based").

    As with the ALJ's explanation for rejecting the RFC opinion of Dr. Demetrius, I am unsatisfied with the Appeals Council's curt treatment of Dr. Goldstein's RFC opinion. I am therefore remanding the case to the Commissioner for a more detailed evaluation of the record.

## CONCLUSION

    For the reasons set forth above, plaintiff's motion for judgment on the pleadings is granted in part and denied in part, and defendant's cross motion for judgment on the pleadings is denied. The case is remanded for further proceedings consistent with this opinion.

**SO ORDERED.**

/s/(BMC)

_____<br>U.S.D.J.

Dated: Brooklyn, New York
       September 12, 2011